UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KATHRYN RAE KIMM,

      Plaintiff,

v.                          Case No:  2:25-cv-439-JES-NPM

CLICK N' CLOSE, INC. f/k/a
MID AMERICA MORTGAGE, INC.
and DE CUBAS & LEWIS, PA,

      Defendants.

_____

**OPINION AND ORDER**

This matter comes before the Court on review of Defendant De Cubas & Lewis PA's ("DCL") Motion to Dismiss Count VII of the Complaint (Doc. #30) filed on October 7, 2025.  Also pending is Defendant Click N' Close, Inc.'s ("CNC") Motion to Dismiss Counts V and VI of the Amended Complaint (Doc. #40) filed on October 27, 2025.  For the reasons set forth below, both motions are denied.

**I.**

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)

(citation omitted).  Additionally, "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" is required.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).  This "more" does not translate into "longer", however, since the bottom line is that a "complaint is a short, plain, direct statement of allegations of fact sufficient to create a facially plausible claim for relief and sufficient to permit the formulation of an informed response."  Trump v. New York Times Co., No. 8:25-CV-2487-SDM-NHA, 2025 WL 2680597, at *2 (M.D. Fla. Sept. 19, 2025).

Rule 12(b)(6) allows a defendant to seek dismissal of a complaint for failure to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint must be "plausible" and "must be enough to raise a right to relief above the speculative level."  Twombly at 555.  The facts alleged in the complaint must be accepted as true and construed in a light most favorable to plaintiff.  ECB USA, Inc. v. Savencia Cheese USA, LLC, 148 F.4th 1332, 1347 (11th Cir. 2025).  The Court uses a two-step process to resolve such a motion to dismiss: The Court first determines what must be pled for the cause of action, then determines whether the well-pleaded factual allegations plausibly suggest an entitlement to relief.  Caterpillar Fin. Services Corp.

v. Venequip Mach. Sales Corp., 147 F.4th 1341, 1347 (11th Cir. 2025).

**II.**

The following facts are derived from the Amended Complaint (Doc. #24), which is the operative pleading.

Plaintiff Kathryn Rae Kimm ("Kimm") suffered catastrophic damage to her home (the "Property") when Hurricane Ian made landfall in Fort Myers, Florida in September 2022. (Id. at ¶ 25.) Kimm had purchased the Property financed by a $221,567 mortgage loan with Prosperity Home Mortgage, LLC ("Prosperity") and secured by the Federal Housing Administration ("FHA"). (Id. at ¶ 8.) The mortgage agreement imposed an obligation on Kimm to maintain continuous hazard insurance coverage on the Property by paying premiums to an escrow account maintained by Prosperity. There was a corresponding obligation on Prosperity, as the servicer, to ensure timely payment of Kimm's insurance premium from the available escrow funds. (Id. at ¶ 9.) Kimm secured a comprehensive hazard insurance coverage plan through Universal Property Casualty Insurance Company ("Universal") and included with each mortgage payment the calculated escrow portion designated for payment to Universal. (Id. at ¶¶ 14-16.)

On June 10, 2021, Prosperity transferred ownership and service of the mortgage to CNC, placing CNC "in control of [Kimm]'s

mortgage account, escrow funds, and the critical responsibility for ensuring continuous insurance coverage through timely premium payments."   (Id. at ¶¶ 12-13.)   Unbeknownst to Kimm, when Universal's annual hazard insurance premium came due on May 27, 2022, CNC failed to make the required disbursement.   When Kimm contacted Universal to initiate a claim for the Property after Hurricane Ian, she was informed, for the first time, that her hazard insurance policy had lapsed.   (Id. at ¶¶ 19-21.)

Upon discovering that her coverage had lapsed, Kimm "immediately contacted CNC to demand an explanation, report the issue, and seek resolution of this critical servicing failure[,]" emphasizing "the urgent nature of the situation," because "her home had sustained major hurricane damage and . . . immediate restoration of insurance coverage was essential to prevent further deterioration and enable necessary repairs."   (Id. at ¶¶ 29-30.) Even though the lapse occurred due to CNC's own failure to abide by its obligations pursuant to the mortgage, CNC attempted to impose a force-placed insurance policy with "substantially inferior coverage[.]"[1]   CNC conditioned acceptance of the force-

---

[1] 12 U.S.C. § 2605(k)(l)(A) allows mortgagers to obtain force-placed coverage in the event that a mortgagee fails to maintain hazard insurance on his or her home.

placed policy on Kimm's execution of a "comprehensive release" of all legal claims against CNC.  (Id. at ¶¶ 32-34, 37.)

In the aftermath of Hurricane Ian, federal authorities designated Fort Myers, Florida a Presidentially Declared Major Disaster Area ("PDMDA").  (Id. at ¶ 48.)  CNC began to offer disaster relief and other disaster-related assistance to mortgage holders.  Kimm contacted CNC to inquire "about the implications and requirements of any disaster assistance programs[,]" specifically seeking to "move three months of her mortgage payments to the end of her loan." (Id. at ¶ 55.)

Kimm spoke to several representatives from CNC, including someone identified in the complaint as "Brandon," about a three-month forbearance option running from October 1, 2022 through December 31, 2022.  Brandon offered "specific assurances that she could participate without incurring late fees, credit reporting consequences, or other adverse effects."  (Id. at ¶¶ 59-60.)  At the time that Kimm inquired about disaster assistance, CNC was aware of the hazard insurance policy lapse due to its earlier conversations with Kimm.  Nevertheless, neither Brandon nor any other CNC representative ever disclosed to Kimm that (1) borrowers unable to repay the deferred amounts "in a single lump sum" at the conclusion of the forbearance period would need to qualify for a disaster loan modification conditioned on FHA approval, and (2)

FHA approval for such disaster loan eligibility would require the subject property to be "fully repaired and habitable at the time of application." (Id. at ¶¶ 61-61.)  Thus, according to Kimm, she agreed to the forbearance option with the "reasonable expectation that her participation would not result in adverse consequences and that repayment would occur through loan term extension rather than immediate lump-sum payment."  Had CNC disclosed the actual terms, Kimm would not have agreed to the forbearance option. (Id. at ¶ 66.)

At the conclusion of the forbearance period, in December 2022, Kimm was unable to repay the deferred amounts in a single lump sum.  (Id. at ¶ 70.)  She also found herself unable to qualify for disaster loan modification through the FHA due to the Property's unrepaired condition – according to Kimm, "a situation entirely created by CNC's earlier [Universal hazard] insurance payment failure."  (Id.)

At some point after Kimm discovered she was ineligible for FHA disaster loan modification, CNC agreed to extend the forbearance period an additional three months, for a total of six months. (Id. at ¶ 76.)  Nevertheless, CNC reported Kimm's mortgage as delinquent to credit reporting agencies – even though she was current on her payments per the terms of the forbearance agreement. CNC's false credit reporting "caused significant damage to

-6-

[Kimm's] credit profile" including score reductions that eventually caused Kimm's pre-approval for a mortgage on a new residential property to be revoked. During this period, CNC sent delinquency notices and payment demands with property inspection and late fees assessed. (Id. at ¶¶ 76-81.) CNC attached additional property inspection fees despite FHA servicing guidelines which permit property inspection only where "efforts to contact the borrower have been unsuccessful." (Id. at ¶ 89.)

At the conclusion of the extended forbearance period, Kimm attempted to resume regular mortgage payments by paying her monthly installment for April and May 2023. (Id. at ¶ 107.) CNC rejected that payment, instead issuing formal notice to Kimm that she was in default. The default notice warned that if Kimm failed to cure the alleged default by making a payment of $12,247.53, the entire loan balance would come due and foreclosure proceedings would be initiated. (Id. at ¶¶ 108-111.)

Kimm contacted Defendant DCL – the attorneys charged with collecting her mortgage debt – on May 12, 2023. In her email to DCL, she forwarded prior communications with CNC documenting her disputes with regard to the mortgage debts. Kimm followed up on May 16, 2023 with a more detailed email "explaining CNC's insurance payment failure, forbearance misrepresentations, improper fees, false credit reporting, and force-placed insurance issues[,]"

including specific names of CNC employees involved in these issues. (Id. at ¶¶ 112-113.)   Nevertheless, on May 26, 2023, DCL sent a debt collection letter demanding the payment of $17,633.26, including $1,975.00 in attorney fees.  The letter further stated that if plaintiff failed to make the payments due, "the foreclosure action will continue," that "another foreclosure action may be filed," and that "the pending foreclosure action will be prosecuted in a normal fashion," despite that no foreclosure action had been filed.  (Id. at ¶¶ 116-118.)  Finally on July 18, 2023, CNC sent Kimm a monthly mortgage statement seeking $45,692.02, including $27,399.24 in "Total Fees Charged," consisting of "attorney fees, litigation charges, and corporate advances "that were either unauthorized, inflated, or fictitious[.]" (Id. at ¶¶ 120-123.)

According to Kimm, she "was never in legitimate default, and any claimed delinquency resulted from CNC's wrongful conduct, including forbearance misrepresentations, insurance payment failures, improper payment rejections, and unauthorized fee assessments."  (Id. at ¶ 127.)  Thus, in July 2025, Kimm obtained counsel and sent a detailed Request for Information ("RFI") pursuant to the Real Estate Settlement Procedures Act ("RESPA") to CNC, seeking specific information about her loan.  (Id. at ¶ 128.) According to Kimm, CNC failed to properly respond both to the RFI

and to her subsequent Notice of Error ("NOE").  (Id. at ¶¶ 128-134.)

On May 23, 2025, Kimm brought the instant action in federal court against CNC and DCL.  (Doc. #1.)  Pertinent to the resolution of the instant Motions to Dismiss (see Docs. #30 and #40), Kimm has brought claims for constructive fraud (Count V) and breach of fiduciary duty (Count VI) against Defendant CNC.  She has also brought a claim for violation of the Florida Consumer Collection Practices Act ("FCCPA") against Defendant DCL, related to its attempts to collect the disputed mortgage debt.[2]  Defendants move to dismiss those counts for various reasons, which the Court will address in turn.

## III.

### A. Constructive Fraud (Count V)

In Count V, Kimm alleges that CNC's material omissions with regard to the consequences of the disaster relief program – e.g. that (1) borrowers unable to repay the deferred amounts "in a single lump sum" at the conclusion of the forbearance period would need to qualify for a disaster loan modification conditioned on FHA approval, and (2) FHA approval for such disaster loan

---

[2] The Complaint contains two claims for relief labeled "Count VII". For purposes of the instant motion to dismiss, the Court will refer to the FCCPA claim against DCL as Count VII.

eligibility would require the subject property to be "fully repaired and habitable at the time of application" – amounted to constructive fraud.  (Doc. #24 at pp. 44-47.)

To state a claim for constructive fraud under Florida law, a party must plead the existence of a fiduciary or confidential relationship.  See Rutstein v. Viva 5 Group, LLC, 766 F. Supp. 3d 1189, 1198 (M.D. Fla. 2025) ("Under Florida law, 'constructive fraud occurs when a duty under a confidential or fiduciary relationship has been abused or where an unconscionable advantage has been taken'" (quoting Am. Honda Motor Co. v. Motorcycle Info. Network, Inc., 390 F. Supp. 2d 1170, 1179 (M.D. Fla. 2005)). "Florida courts have construed the term 'fiduciary or confidential relation' as being very broad."  Kelly v. Nelson, Mullins, Riley & Scarborough, L.L.P., No. 08:01-cv-1176-T-27-MAP, 2002 WL 598427, at *8 (M.D. Fla. Mar. 20, 2002).  Although, as CNC points out, the relationship between a mortgage borrower and mortgage lender is not ordinarily a confidential relationship, see McCulloch v. PNC Bank, Inc., 298 F.3d 1217, 1226 n.13 (11th Cir. 2002), in certain special circumstances a fiduciary relationship may develop.  "The burden of proving such a fiduciary relationship is on the party asserting it."  Allen v. First Unum Life Ins. Co., No. 2:18-cv-69-FtM-99NPM, 2020 WL 6203454, at *4 (M.D. Fla. Oct. 22, 2020)

(citing <u>Orlinsky v. Patraka</u>, 971 So. 2d 796, 800 (Fla. 3d DCA 2007)).

Kimm alleges several facts which she believes constitute special circumstances giving rise to a fiduciary relationship for purposes of her constructive fraud claim, including: (1) CNC voluntarily undertook to provide disaster related assistance to Kimm and other borrowers beyond the terms of the mortgage agreement (Doc. #24 at ¶ 219), (2) CNC held exclusive control over the disaster relief options available to Kimm (<u>id.</u> at ¶ 220), (3) Kimm reposed trust and confidence in CNC to advise her on disaster relief options and CNC and its representatives knowingly accepted this trust (<u>id.</u> at ¶ 222), and (4) CNC positioned itself as a reliable and authoritative source for disaster related mortgage relief when advising Kimm as to her forbearance options (<u>id.</u> at ¶ 223).

CNC moves to dismiss Count V, arguing that there is no plausible basis to find a fiduciary relationship because CNC and Kimm were dealing at arm's length as parties in the mortgage loan relationship and CNC was obligated to offer loss mitigation options pursuant to FHA regulations.  (Doc. #40 at p. 5.)  Thus, according to CNC, it never assumed any extra duties beyond its obligations under the agreement, and no fiduciary relationship was ever formed. (<u>Id.</u>)  Kimm responds that even if CNC was required under FHA

regulation to offer such assistance, Florida law recognizes that a fiduciary relationship can arise where one party places trust in another and that trust is knowingly accepted. (Doc. #47 at p. 18.) The Court agrees with Kimm that this count is sufficiently pled.

While the lender-borrower relationship is typically an arm's length transaction, this rule yields where "special circumstances" transform the relationship into a fiduciary one. Such circumstances exist where a lender (1) "takes on extra services for a customer," (2) "receives any greater economic benefit than from a typical transaction," or (3) "exercises extensive control." Bldg. Educ. Corp. v. Ocean Bank, 982 So. 2d 37, 41 (Fla. 3d DCA 2008) (citations omitted). Upon review of the Complaint, the Court finds that even absent a voluntary undertaking of "extra services," the remaining factors plausibly establish a fiduciary relationship.

Florida law recognizes that the standard arm's length characterization must give way where a "lender . . . exercises extensive control" over the borrower's business. Capital Bank v. MVB, Inc., 644 So. 2d 515, 519 (Fla. 3d DCA 1994). Here, the allegations — taken as true — demonstrate that CNC maintained near-exclusive control over the disaster relief and forbearance options available to Kimm following Hurricane Ian, creating a significant disparity in bargaining power. When a lender knowingly leads the

plaintiff to believe that her interest will be looked out for, a fiduciary relationship may arise. See First Nat. Bank & Tr. Co. of Treasurer Coast v. Pack, 789 So. 2d 411, 415 (Fla. 4th DCA 2001)(noting that "a fiduciary relationship arises where 'the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him.'" (internal citations omitted)).

CNC fostered this relationship by positioning itself as a reliable, authoritative source for crisis-related guidance, thereby actively soliciting Kimm's reliance. That CNC's representatives knowingly accepted Kimm's trust while navigating her through complex forbearance options allows a reasonable inference of a relationship that transcended a mere commercial contract. See Quinn v. Phipps, 113 So. 419, 421 (Fla. 1927) (finding a fiduciary relation exists where "confidence is reposed by one party and a trust accepted by the other").

The implied fiduciary relationship imposed a duty of good faith and candor on CNC exceeding the standard requirements of the mortgage instrument. See Florida Coastal Sch. of Law, Inc. v. Cardona, No. 3:21-CV-721-MMH-JBT, 2021 WL 3493311, at *23 (M.D. Fla. Aug. 9, 2021) (noting that "[a] fiduciary has 'an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ

-13-

reasonable care to avoid misleading' the beneficiary of the fiduciary duty.")  Accordingly, the Court finds that Kimm has pled sufficient facts to plausibly establish a fiduciary relationship and corresponding duties pursuant to the special circumstances doctrine.

CNC next argues that Count V must be dismissed because Kimm has failed to plead with the requisite particularity how CNC "exploited Plaintiff's vulnerability for its own benefits" in a way that presents a plausible claim for relief.  (Doc. #40 at p. 10.)

CNC's blanket assertion that Kimm's constructive fraud claim must be pled with particularity is not fully accurate.  Nor is Kimm's argument that she is entirely immune from the heightened pleading standard.  A pleading containing allegations of fraud is generally subject to a heightened pleading standard.  See Fed. R. Civ. P. 9(b).  But constructive fraud – unlike actual fraud – need only meet the liberal pleading requirements of Rule 8.  See Linville v. Ginn Real Estate Co., LLC, 697 F. Supp. 2d 1302, 1309 (M.D. Fla. 2010).  However, "any special circumstances giving rise to a fiduciary duty must be pled with particularity" so as to allow the Court to determine as a matter of law whether such a duty existed.  Heyward v. Wells Fargo Bank, No. 8:20-cv-572-T-33AAS, 2020 WL 10353829 at *9 (M.D. Fla. Oct. 6, 2020) (citing Parker v.

-14-

Gordon, 442 So.2d 273, 275 (Fla. 4th DCA 1983)).  Thus, to the extent that Kimm alleges that a fiduciary relationship arose between the parties under the special circumstances doctrine, these allegations are indeed subject to Rule 9(b)'s heightened pleading standard.  While Rule 9(b) does not abrogate the concept of notice pleading, it requires a complaint to set forth: (1) the precise statements or omissions made; (2) the time, place, and person responsible for the statements; (3) the content and manner in which the statements misled the plaintiff; and (4) what the defendant obtained as a consequence.  FindWhat Inv'r Group v. FindWhat.com, 658 F.3d 1282, 1296 (11th Cir. 2011).

The Court finds that Kimm has pled sufficient facts to state a plausible claim for constructive fraud, satisfying even the more demanding particularity requirements of Federal Rule of Civil Procedure 9(b). Kimm's Complaint alleges that in the aftermath of Hurricane Ian, a specific CNC customer service agent, "Brandon," used telephonic representations to "specifically [assure her] she could enter the three-month forbearance period . . . without incurring late fees, credit reporting consequences, or other adverse effects."  (Doc. #24 at ¶¶ 59-61.)  Kimm further alleges that these representations were misleading because CNC failed to disclose a critical condition: that borrowers unable to repay deferred amounts in a single lump sum would be required to qualify

-15-

for an FHA disaster loan modification — a condition Kimm could not meet due to the lapse in her hazard insurance coverage.   (Id. at 62.)  According to the Complaint, these material omissions deprived Kimm of the opportunity to make informed decisions and left her "legally and financially vulnerable" once the forbearance period concluded.

Because Kimm has specified the exact statements and omissions, identified the representative responsible, described the context of the exchange, and detailed the resulting harm, the Court finds these allegations are pled with sufficient particularity under the "special circumstances" doctrine.  CNC's Motion to Dismiss is denied as to Count V of the Complaint.

**B. Breach of Fiduciary Duty (Count VI)**

In Count VI, Kimm alleges that CNC breached its fiduciary duty of honesty, full disclosure, and good faith by failing to disclose material terms of the forbearance program it offered her. (Doc. #24 at pp. 47-49.)  To survive a motion to dismiss a claim for breach of fiduciary duty, a plaintiff must plausibly allege: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damage proximately caused by that duty.  Brouwer v. Wyndham Vacation Resorts, Inc., 336 So. 3d 372, 373 (Fla. 5th DCA 2022) (citing Sola v. Markel, 320 So. 3d 326, 328 (Fla. 5th DCA 2021)).

-16-

CNC asserts that a fiduciary relationship "did not and could not" exist between the parties because neither party owed a duty to protect or benefit the other. (Doc. #40 at p. 10.)  However, as established in the Court's prior discussion, Kimm has pled sufficient "special circumstances" to elevate the mortgagor-mortgagee interactions to a plausible fiduciary relationship.

The Complaint alleges that CNC maintained near-exclusive control over the disaster relief and forbearance options available to Kimm in the wake of Hurricane Ian.  Furthermore, the allegations — taken as true — demonstrate that CNC actively solicited Kimm's trust and positioned itself as an authoritative guide through the complexities of post-disaster mitigation.  By knowingly accepting this trust, CNC assumed a duty that transcended the standard arm's length transaction.  Because the Complaint sufficiently establishes the existence of this duty and the subsequent failure to disclose material program terms, CNC's Motion to Dismiss Count VI is denied.

### C. FCCPA Violation (Count VII)

Count VII of the Complaint alleges that Defendant DCL violated Section 559.72 of the Florida Consumer Collection Practices Act ("FCCPA") by knowingly attempting to collect amounts from Plaintiff that were not legally owed.  (Doc. #24 at pp. 52-55.) Section 559.72 provides, in pertinent part, that a person cannot

-17-

"[c]laim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist."   Fla. Stat. § 559.72(9).   Kimm alleges that DCL illegally attempted to collect the following:

> **a. Late fees** charged during and after an active forbearance period, despite Plaintiff being assured by CNC that no such penalties would be assessed;
>
> **b. Property inspection fees** that were repeatedly assessed without a legal basis, in violation of FHA servicing rules which prohibit inspection charges when a loan is not in default and the servicer has made contact with the borrower;
>
> **c. Foreclosure-related attorney fees and costs** reflected in mortgage statements, even though no foreclosure action had been filed at the time and Plaintiff was actively attempting to resolve her account in good faith;
>
> **d. Inflated or duplicative litigation fees** included in the July 2023 mortgage statement, such as a $25,000.00 "corporate advance" fee marked both as charged and waived, yet still counted in the total amount due.

(Id. at ¶ 262.)

DCL moves to dismiss Count VII, asserting that Kimm has not sufficiently pled that DCL had actual knowledge that the debt was not legitimate because (1) Kimm has not indicated *which* email addresses she used to contact DCL about the collection notices, and (2) Kimm has failed to sufficiently plead that the alleged

-18-

debt was not legitimate.  DCL further argues that Kimm has failed to state a claim under the FCCPA because her allegations that DCL's collection letter was "threatening" are vague and conclusory. Finally, DCL contends that it is protected by litigation privilege and Kimm's claims against it are barred as a matter of law.  The Court will address each argument in turn.  (See Doc. #30.)

### (1)   Actual knowledge that debt was not legitimate

The Court finds unpersuasive DCL's argument that the Complaint fails to sufficiently plead knowledge of the illegitimate debt.  The Complaint specifically alleges that Kimm contacted DCL via email on May 12, 2023, forwarding prior communications with CNC that documented her mortgage debt disputes. Kimm followed up on May 16, 2023, with a more comprehensive email detailing "CNC's insurance payment failure, forbearance misrepresentations, improper fees, false credit reporting, and force-placed insurance issues," including the specific names of the CNC employees involved.  (Doc. #24 at ¶¶ 113-118.)  The Complaint is allowed to plead knowledge "generally." Fed. R. Civ. P. 9(b).

Contrary to DCL's assertions, the absence of a specific email address or a named recipient within DCL's organization does not render the claim deficient.  Under the federal notice pleading standard, a plaintiff is not required to plead evidentiary details

-19-

to survive a motion to dismiss.  Because the Complaint identifies the dates, the sender, and the specific substantive content of the notice provided to DCL, it successfully "state[s] a claim to relief that is plausible on its face." Bell Atl. Corp., 550 U.S. at 570.

Kimm alleges that DCL attempted to collect, inter alia, (1) late fees assessed during an active forbearance period, (2) property assessment fees assessed without a legal basis in violation of FHA servicing rules, (3) foreclosure-related attorney fees and costs, even though no foreclosure action had been filed at that time, and (4) inflated or duplicative litigation fees included in the July 2023 mortgage statement, such as a $25,000.00 "corporate advance" fee marked both as charged and waived.  The Court finds that these allegations are sufficient to plausibly plead that the debt was not legitimate.  See Harb v. Westlake Services LLC, 748 F. Supp. 3d 1170, 1192 (M.D. Fla. 2024) (finding that a jury question existed because the plaintiff informed the defendant during two phone calls that he never purchased the vehicle, yet the defendant sent the statement anyway.)

### (2) Adequacy of allegations regarding debt collection letter

DCL contends that Kimm's FCCPA claim fails because her allegations of "threatening" language are conclusory, arguing that a warning of potential foreclosure is merely a statement of

contractual rights rather than an unlawful threat.  This argument misses the mark. An "unlawful threat" is not a necessary factual predicate for an FCCPA violation under Florida Statutes § 559.72(9).   That section prohibits a person from claiming, attempting, or threatening to enforce a debt — or asserting a legal right — while knowing the debt is illegitimate or the right does not exist.  Fla. Stat. § 559.72(9).  Here, Kimm alleges that DCL's letter repeatedly stated foreclosure would continue or be refiled if the debt remained unpaid, even though no legitimate debt existed. Whether or not these statements are characterized as "threats," the allegations sufficiently plead that DCL attempted to enforce a non-existent debt in violation of the statute.

### (3)  Litigation Privilege

DCL asserts that Kimm's FCCPA claims are barred by Florida's litigation privilege.   Generally, this affirmative defense "provides all persons involved in judicial proceedings, including parties and counsel, an absolute privilege from civil liability for acts taken in relation to those proceedings." N. Star Capital Acquisitions, LLC v. Krig, 611 F. Supp. 2d 1324, 1329 (M.D. Fla. 2009) (citing Levin, Middlebrooks, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co., 639 So.2d 606, 608 (Fla.1994)).

However, applying the privilege to the facts alleged here would "eviscerate the FCCPA" by allowing debt collectors to evade

liability for the very abusive practices the statute was designed to prevent.  See N. Star Capital Acquisitions, 611 F. Supp. 2d at 1332.  In any event, the Court finds that the litigation privilege does not apply where, as here, a party is alleged to have knowingly sought to collect on a debt that does not exist prior to the initiation of any judicial proceeding.  See Moise v. Ola Condominium Association, Inc., 314 So. 3d 708 (Fla. 3d DCA 2021).

The Complaint alleges that DCL's communications — including the threat to continue or refile foreclosure actions — were predicated on a non-existent debt and prior to litigation. Accordingly, DCL's motion to dismiss the FCCPA claim is denied.

Accordingly, it is now

**ORDERED:**

1. Defendant Click n' Close's Motion to Dismiss (Doc. #40) is **DENIED.**

2. Defendant De Cubas & Lewis, P.A.'s Motion to Dismiss (Doc. #30) is **DENIED.**

**DONE AND ORDERED** at Fort Myers, Florida, this __27th__ day of April 2026.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Parties of record

-22-